Bruce S. Asay  W. S. B. # 5 – 1739
Gregory B. Asay W.S.B. #5-7032
Associated Legal Group, LLC
1812 Pebrican Ave.
Cheyenne, WY 82001
(307) 632-2888
(307) 632-2828 (fax)

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 JAN 15  PM 4: 12

STEPHAN HARRIS, CLERK
CHEYENNE

*Attorneys for Plaintiff, Amil Hale*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| AMIL HALE, | ) | |
| Plaintiff, | ) | |
| | ) | Docket No. 19CV9-MLC |
| vs.. | ) | |
| | ) | |
| SCHLUMBERGER TECHNOLOGY | ) | |
| CORPORATION, a foreign corporation | ) | |
| authorized to do business in Wyoming, | ) | |
| | ) | |
| Defendant. | ) | |

### VERIFIED COMPLAINT

The Plaintiff, Amil Hale (Plaintiff or Hale), by and through his undersigned counsel, for

his Complaint, against Defendant, Schlumberger Technology Corporation (Defendant or

Schlumberger), states and alleges as follows:

### INTRODUCTION

1.      This is an action brought by the Plaintiff against Schlumberger, the Defendant, for

violations of the Americans with Disabilities Act of 1990 (as amended) and certain state law

claims. The Plaintiff brings this action for actual and compensatory damages as well as

attorney's fees. The Plaintiff brings this *Complaint* for discrimination and retaliation based on his

unlawful demotion and de facto termination from employment in 2016 where Mr. Hale

previously worked for the Defendant as an Equipment Operator III.

1

**PARTIES**

2. Mr. Hale is a resident of Petersboro, Utah. At all times relevant to this action, Plaintiff was employed by Defendant Schlumberger at the company's Cheyenne facility. The Plaintiff is an individual with a disability in that he suffers from debilitating "tics" which act similar to Tourette's syndrome which affects certain major life activities.  He is a member of a protected group as he is disabled

3. Schlumberger Technology Corporation is a subsidiary of Schlumberger Limited which was originally founded in France and currently incorporated in Netherlands Antilles, with U.S. headquarters in Texas.  Defendant has become the world's largest oil field servicer, now employing approximately one hundred thousand employees in eighty-five countries. Schlumberger is authorized to do business in Wyoming and operates facilities in Cheyenne, Laramie County, Wyoming.

**JURISDICTION**

4. This Court has jurisdiction over this matter as the causes of action arose under the laws of the United States of America and the state of Wyoming. As the acts complained of herein were and are now being committed within the state of Wyoming, this Court has jurisdiction over any contract, statutory or common law claim.

5. At the filing of this lawsuit, the Plaintiff has accomplished all conditions precedent to bringing this litigation which includes the filing of a claim with the Wyoming Department of Workforce Services and the Equal Employment Opportunity Commission ("EEOC").  As a condition precedent to bringing this action, the Plaintiff has received a determination in his favor attached hereto as **Exhibit 1** and a right to sue letter attached hereto as **Exhibit 2**, which requires the filing of a lawsuit within 90 days of October 29, 2018.

## GENERAL FACTUAL ALLEGATIONS

6.     The Plaintiff began working for Defendant on December 11, 2011 and received a promotion and raise every year until approximately February of 2014. Plaintiff very much enjoyed the work as he found it rewarding and stimulating. He believed the company was treating him well and had substantial opportunities for advancement. He believed that this would be where he would be working until he retired.

7.     The Plaintiff is disabled and suffers from a form of neuropsychiatric hyper-startle syndrome[1]. The disability is similar to Tourette's syndrome in that the Plaintiff has tics which can be involuntarily triggered. The disability affects major life activities of the Plaintiff and he was regarded as disabled by the Defendant employer.

8.     The Plaintiff's "tics" can be triggered by certain loud tones of speech as well as certain words, and if he is not triggered remains asymptomatic. If triggered, the Plaintiff has a variety of tics, the most severe causing him to self-mutilate on command.

9.     Although the Plaintiff experienced name calling and harassment from the very beginning of his employment, for several years he tolerated the abuse as essentially "razing the new guy" as he enjoyed the work and continued to get good evaluations and frequent raises and promotions.

10.     Employment conditions began to change in the beginning of 2014. Plaintiff's new direct supervisor, Jerred Lohman discovered the Plaintiff was disabled and the Plaintiff's employment took a turn. By the summer of 2014 the Plaintiff was constantly the subject of

---

[1] A note from examining neurologist, Michael H. Williams, M.D. describing the disability is attached hereto as **Exhibit 3.**

jokes and harassment which now appeared sanctioned if not instigated by the Plaintiff's supervisor. Plaintiff's co-workers repeatedly took action to trigger his "tics" and laughed at him.

11.     For a year the Plaintiff frequently and repeatedly pleaded with his co-employees and his supervisor to stop the harassment with no relief. Finally, on July 25, 2015 the Plaintiff went above his supervisor's head and complained to manager, Brad Okland; the supervisor of Jerred Lohman.

12.     Brad Okland had witnessed the mistreatment previously, but had failed to take any action. When Plaintiff made a formal complaint, Okland assured the Plaintiff that the harassment would stop. Okland sent out a single email to employees of Defendant admitting that Plaintiff was the subject of mistreatment and calling for the immediate end to the discrimination/harassment.

13.     The single email from Okland was ineffective and Plaintiff reached out to Okland and another supervisory employee, Paul Culek to inform them that the harassment continued and requesting relief. At least one other co-employee, Jeff Fitch also requested the supervisors do something to stop the harassment. There is no record of either supervisor taking any additional steps to stop the disability based mistreatment which continued.

14.     Plaintiff, after seeing no further action was being taken by the first three supervisors that were formally informed of the harassment, escalated his issue to the Defendant Company's HR department, speaking with a Matthew Campana. Campana assured Plaintiff that the company was going to investigate his complaint, but no findings or action was ever presented to Plaintiff or any other record that an investigation actually resulted.

15.     Plaintiff's formal complaint to HR was not helpful and resulted in the Plaintiff being removed from his former crew and required to work in isolation doing menial tasks. The Defendant has admitted Plaintiff was removed "because he was having issues with his supervisor and crew." Plaintiff was demoted because he reported that he was being harassed and mistreated.

16.     After a few days in isolation, the Plaintiff was transferred to a new crew under the supervision of T.J. Overgaard. When Plaintiff arrived for work the new crew was already fully informed of his disability, the previous mistreatment and most relevant, the multiple complaints he had filed.

17.     Although at this point, in late summer of 2015, the Plaintiff had been with the Defendant Company for four years, he was treated like the low man on the totem pole and forced to do grunt work normally reserved for new employees. Mr. Overgaard would require Plaintiff to wait in the shop when Plaintiff's old crew would begin work in an effort to intimidate and further humiliate the Plaintiff.

18.     Additionally, the new crew escalated the mistreatment and, for the first time, started making accusations of poor job performance and continued to isolate the Plaintiff in an effort to ostracize and alienate. The new crew also began to make fun of those that associated with the Plaintiff, further alienating the Plaintiff from his peers and making his work more difficult.

19.     The Plaintiff's work vehicle was taken from him without notice, cause or explanation and he was forced to work alone and do tasks that would typically require multiple people. One task eventually leading to physical injury because he was unassisted.

20.     Plaintiff persevered in an effort to keep stable employment and provide for his family, but the HR complaint had had a negative effect on his work environment and he was not provided with any information on the investigation allegedly taking place on his behalf. The inaction and mistreatment by his supervisors and uncertainty of his position combined with harsh and retaliatory treatment of his coworkers caused the Plaintiff substantial stress which eventually developed into panic attacks, insomnia, depression and other physical manifestations.

21.     After more than a year with no action and no improvement in his job conditions, Plaintiff again escalated his complaint, this time to a Vincent Luley, Schlumberger, West Basin HR Manager by email. Oddly, Mr. Luley was not aware of any investigation into the mistreatment of the Plaintiff but stated he would conduct his own and for the first time in a long time the Plaintiff was hopeful the harassment would stop and he could get back to working unabated.

22.     Unfortunately, by November of 2015, Mr. Luley quit responding to Plaintiff's emails and there was no change in the work environment.  At present, Mr. Hale is aware of no findings in any alleged investigation undertaken by the Defendant and no disciplinary action being taken.  No such findings were disclosed or discovered during the EEOC and WFEP investigation.

### CLAIM I-Violation of the Americans with Disabilities Act ("ADA")

23.     Plaintiff incorporates and re-alleges each and every preceding allegation as if fully set forth herein.

24.     The ADA makes it unlawful for any employer to discharge or discriminate against an individual who is disabled. At the time of Defendant's discriminatory termination of the

Plaintiff, Hale; (1) Plaintiff was disabled under the definition of the ADA; (2) he was qualified

for the position that he held; (3) his employment was adversely affected or terminated; and (4)

the defendant subsequently demonstrated a continuing need for services and replaced him with a

non-disabled person.

25.     Plaintiff was subject to discriminatory treatment, denied promotion and

eventually terminated in violation of the Americans with Disabilities Act. The Defendant has

acknowledged the harassment but downplays its severity referring to the mistreatment as

"teasing." Defendant's stated reasons for terminating the Plaintiff's employment are pretextual

as the Defendant discriminated against the Plaintiff because of his disability and failed to

reasonably accommodate his disability by providing him with appropriate employment

consistent with the provisions of the ADA. In fact the Defendant did not work with Plaintiff to

reach any appropriate accommodation.

26.     As a direct and proximate cause of the Defendant's unlawful, willful and

discriminatory action, Plaintiff has suffered damages, including: lost wages, both past and future,

as well as the benefits associated with his employment and will continue to lose such benefits in

the future. He has also suffered physical and emotional pain and incurred attorney's fees and

costs to which he is entitled.

### CLAIMS II and III- Civil Assault and Battery

27.     Plaintiff incorporates and re-alleges each and every proceeding allegation as if

fully set forth herein.

28.     Wyoming has long recognized the torts of civil assault and battery as a

compensable injury in the state. See *Condict v. Hewitt*, 369 P.2d 278, (1962); *Jung-Leonczynska*

*v. Steup*, 782 P.2d 578, (1989).

29.     In the present case, the Defendant, acting through agents and supervisors, multiple times over a course of several years, took advantage of Plaintiff's disability by using trigger words and actions knowing the same would cause Plaintiff physical injury.

30.     In some instances, the abuse of Plaintiff's disability did not result in physical injury and only in imminent apprehension, and in some instances the abuse resulted in substantial physical injury.

31.     Defendant knew that saying certain phrases or making certain noises would trigger the Plaintiff into self-harm, at a minimal causing the Plaintiff to uncontrollably freeze motor functions.  At the worst, the Defendant used Plaintiff's triggers knowing the same would cause the Plaintiff to strike his own testicles repeatedly until he would pass out from the pain.

32.     Defendant without justification or provocation, and usually for a laugh or base entertainment, committed an assault and battery upon the Plaintiff. In each case the assault and battery was committed in a wanton, reckless and oppressive manner entitling the Plaintiff to exemplary and punitive damages.

## CLAIM IV - Negligence

33.     Plaintiff incorporates and re-alleges each and every proceeding allegation as if fully set forth herein.

34.     Defendant had a duty to the Plaintiff to act as a reasonable employer and reasonable person during Plaintiff's employment and provide a safe and respectful working environment.

35.     Defendant, acting through its agents and supervisors, in addition to the harassment identified above, required Plaintiff as part of his employment to do tasks which were

typically performed by two to three employees as they were particularly dangerous and required more strength than one employee could exert.

36.     Defendant knew, or should have known that requiring Plaintiff to perform these tasks alone would result in physical injury to the Plaintiff.

37.     Plaintiff, while performing one such task suffered a substantial and likely lifelong injury. After the injury, the Defendant employees were unsympathetic and attempted to shift blame onto Plaintiff. Defendant sent the Plaintiff home and began the process of terminating his employment.

38.     Plaintiff is entitled to recover for the medical expenses, including treatment for diagnosed post-traumatic stress disorder, persistent nightmares, inability to sleep and mental anguish which he has incurred as a result of Defendant's actions and to compensation for reasonably foreseeable pain and suffering caused thereby.

## CLAIM V - Retaliation in contradiction to the ADA

40.     Plaintiff incorporates and re-alleges each and every proceeding allegation as if fully set forth herein.

41.     Plaintiff was hired as an equipment operator. He quickly worked his way up to equipment operator III and was considered by the Defendant to be a supervisor in training.

42.     However, when Plaintiff made a complaint of harassment to his supervisor in July of 2015 he was threatened by his supervisor and other employees and the discrimination and harassment continued unabated. His supervisor made some pretextual excuses for not promoting the Plaintiff or allowing him to attend supervisor training, however these stated reasons were determined to be false by the EEOC and WFEP investigations performed as a condition precedent to this action.

43.     When Plaintiff escalated his complaint to Defendant's HR department in August of 2015, he was demoted from being a supervisor in training and transferred first to work alone doing menial tasks and then to a new crew where he was treated like a new employee and given only grunt work and more menial tasks.

44.     Further, two co-employees that were similarly situated with the Plaintiff, also supervisors in training, were allowed to enroll in supervisor training school and eventually promoted to supervisors with an increase in pay, benefits and bonuses.

45.     Plaintiff was denied promotions, raises and bonuses he should have received as a supervisor in training, demoted, and threatened because he complained to his supervisor and then HR that he was being discriminated against.

46.     Plaintiff's supervisor, after discovering Plaintiff's disability, stated that he removed him from the fast track to being a supervisor because he believed Plaintiff's disability would be a distraction in the field that prevented Plaintiff from being qualified for that position.

47.     Plaintiff is entitled to the compensation equal to the salary he would have received had he been promoted to supervisor from 2015 until his planned retirement at age seventy, including estimated bonuses and other benefits as will be shown at trial.

## CLAIM VI- Breach of Contract, both Express and Implied

48.     Plaintiff incorporates and re-alleges each and every proceeding allegation as if fully set forth herein.

49.     At the time the Plaintiff was employed by Defendant, the parties entered into an employment contract of indefinite duration under which the Plaintiff agreed to work for the Defendant in return for appropriate compensation.

50.     At the time the parties entered into the contract, the Defendant distributed copies of its personnel policy manual to its employees, including the Plaintiff, which provided that the Defendant would discipline employees and discharge them for good cause in accordance with the discharge procedure set forth in the policy manual. Moreover, the policy manual confirmed that the Defendant would abide by federal and state law and particularly those laws relating to the ADA.

51.     Plaintiff was aware of the Defendant's policies as set forth in the policy manual as well as verbally represented to him. He continued to work for the Defendant in reliance on the Defendant's representations concerning appropriate and fair treatment in regard to payment, promotions and employment longevity.

52.     Notwithstanding the verbal and express written provisions as promised to the Plaintiff, the Defendant breached the provisions of the employment agreement in failing to abide by federal and state law in that it failed to properly care for the Plaintiff.  Notwithstanding his disability, it failed to accommodate his disability or perceived disability, and then engaged in acts of retaliation and ultimately termination-all of which constitute a breach of the employment contract.

53.     As a result of the Defendant's wrongful treatment and his discharge, the Plaintiff has suffered damages including lost earnings, future earnings and incurred expenses due to the breach.

## CLAIM VII-Intentional Infliction of Emotional Distress

54.     Plaintiff incorporates and re-alleges each and every proceeding allegation as if fully set forth herein.

55.    Defendant through its agents and employees negligently inflicted emotional distress on Plaintiff by knowingly labeling him as disabled and constantly harassing him and making fun of him.  Defendant took advantage of his disability and used Plaintiff's weakness for its own amusement even knowing that physical pain would result.  Defendant used trigger words to take control of Plaintiff's body and left him powerless and vulnerable.  Additionally, the Defendants would use the Plaintiff's disability to embarrass him in front of women coworkers and in front of supervisors and higher-ups.  Defendant employees also physically tied the Plaintiff up for their own amusement.

56.    Defendant's agents and employees also used Plaintiff's disability to embarrass him in front of visiting officials and bosses in a further effort to humiliate and dehumanize Plaintiff.

57.    Plaintiff has been in counselling since his separation with the Defendant and currently suffers from severe depression and suicidal thoughts.  Intervention has been necessary to prevent self-harm on multiple occasions.

58.    Defendant acted in an intentional, malicious and oppressive manner and Plaintiff is entitled to reasonable compensation for the mental anguish and pain intentionally caused by Defendant.

### CLAIM VIII-Enhanced Compensatory Damages

59.    Plaintiff incorporates and re-alleges each and every proceeding allegation as if fully set forth herein.

60.    In addition to the conduct outlined above the Defendant by its agents and employees embarked on a course of conduct to discredit the Plaintiff and to cause him to resign and/or be terminated. The course of conduct included making fun of the Plaintiff, threatening him, harassing him, demoting him, requiring him to perform menial tasks, denying the Plaintiff

opportunity for promotion, slandering his reputation and embarrassing him in front of business relations. The Defendant through its agents and employees acted in a wanton, intentional, malicious or oppressive manner justifying an award of enhanced compensatory or punitive damages.

61.     As Defendant is the largest oilfield servicer in the world, an amount sufficient to punish the Defendant and encourage reform will be alleged at trial.  Plaintiff is not required to prove such an amount with exactitude.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays for relief of the court as follows:

1.     For Judgment against Defendant in favor of Plaintiff sufficient to compensate him for injuries caused by the unlawful actions of the Defendant as will be proved at trial;

2.     For past wages, front pay, back pay, benefits, future losses, emotional pain, suffering, inconvenience, mental suffering, loss of enjoyment of life, prejudgment interest, all due to the Defendant's interference with Plaintiff's constitutional and civil rights as guaranteed by the Constitution of the United States of America and state of Wyoming;

3.     For punitive and exemplary damages relating to Defendants malicious, intentional and wanton misconduct including assault and battery which was allowed with impunity throughout Plaintiff's employment; and

4.     For Plaintiff's costs and reasonable attorney's fees incurred herein pursuant to federal and state law; and for such other relief this Court deems just and equitable in the premises.

DATED this __15__ day of January, 2019.

_____
Bruce S. Asay W. S. B. # 5 – 1739
Gregory B. Asay W.S.B. #5-7032
1812 Pebrican Ave.
Cheyenne, WY 82001
(307) 632-2888
(307) 632-2828 (fax)
Attorneys for Plaintiff

## Demand for Jury

The Plaintiff demands a trial by jury of six peers on all issues so triable.

_____
Bruce S. Asay W. S. B. # 5 – 1739
Gregory B. Asay W.S.B. #5-7032
1812 Pebrican Ave.
Cheyenne, WY 82001
(307) 632-2888
(307) 632-2828 (fax)
Attorneys for Plaintiff

Verification

I, Amil Hale, am the Plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in the city of ___Logan___, county of ___Cache___, state of ___Utah___.

___*(signature)*___                          ___01-10-2019___
Amil Hale                                          Dated

STATE OF ___Utah___            )
                                               ) SS.
COUNTY OF ___Cache___      )

NOTARY PUBLIC
CYDNEY C SHIELDS
COMM. # 701953
COMMISSION EXPIRES
AUGUST 24, 2022
STATE OF UTAH

The foregoing instrument was acknowledged, subscribed, and sworn to before me this ___10___ day of ___January___, 2019 by Amil Hale.

___*Cydney C. Shields*___
Notary Public

My Commission Expires: ___August 24, 2022___

## WYOMING DEPARTMENT OF WORKFORCE SERVICES
## FAIR EMPLOYMENT PROGRAM

| | |
|---|---|
| Amil Hale | ) |
| c/o Greg Asay, Esq. | ) |
| Associated Legal Group, LLC | ) |
| 1807 Capitol Ave. Suite 203 | ) |
| Cheyenne, WY 82001 | ) |
| | ) |
| | ) |
| COMPLAINANT, | ) |
| | )  WFEP #159-2015 |
| v. | )  EEOC #32K-2016-00029 |
| | ) |
| Schlumberger | ) |
| HR Compliance Department | ) |
| 3600 Briarpark Dr. | ) |
| Houston, TX  77042 | ) |
| | ) |
| RESPONDENT. | ) |

## DETERMINATION

I.   Introduction

Under the authority vested in me by the Department of Workforce Services, the following Determination is issued as to the merits of the subject charge filed under the Americans with Disabilities Act of 1990, as amended, and the Wyoming Fair Employment Practices Act of 1965, as amended.

All requirements for coverage have been met.  Complainant alleges Respondent discriminated against him on the basis of his disability, Respondent's regard for Complainant as disabled and retaliated against him for complaining about disability in violation of the Americans with Disabilities Act, and the Wyoming Fair Employment Practices Act.  Specifically, Complainant asserts Respondent subjected him to disability based harassment and denied him training as well as a promotion due to his disability and Respondent's regard for him as disabled.  Complainant further asserts Respondent retaliated against him for complaining about the disability based harassment by continuing to harass him, deny him bonuses and demoting him.

Respondent provided a position statement in which Respondent denied discriminating against Complainant.  Respondent asserts it took adequate and effective action to end any harassing behavior Complainant may have experienced.



EXHIBIT
1

*WFEP #159-2015*
*EEOC # 32K-2016-00029*
*Page 2*

II.   Findings

Respondent owns and operates an oil company with 15 or more employees with facilities located in Wyoming.  Complainant began working for Respondent on December 11, 2011 and eventually worked out of Respondent's Cheyenne, Wyoming location as an Equipment Operator 3 (EO3).

Complainant asserts he is a member of the protected groups, disabled and regarded as disabled. Complainant further asserts his disability substantially limits him in a major life activity and Respondent regarded him as disabled in a major life activity as Respondent denied him training and a promotion due to his impairment.

Complainant explains he suffers from Tourette's syndrome, which can be triggered by "certain loud tones of speech" as well as certain words. Complainant notes when he hears a certain tone of speech he jumps, or when someone says "freeze" he involuntarily becomes immobile for a few moments. Complainant further reports one of his tics, if triggered, causes him to strike himself in the testicles.

Respondent states at no time did Complainant provide Respondent with any medical documentation regarding any impairment he may have suffered from; however, Respondent acknowledge Complainant informed the business he has Tourette's syndrome.

Complainant asserts he was subjected to disability based harassment. Complainant notes his immediate supervisor and coworkers would call him names due to his disability. Complainant further reports his supervisor and coworkers would deliberately engage in behaviors aimed at triggering his disability or exacerbating it. Complainant explains in February 2014, his immediate supervisor learned of his disability and some of the triggers for his tics. Complainant states thereafter the supervisor and others on his crew would attempt to trigger Complainant. Complainant relates when he tried to tell his supervisor and coworkers to stop, they would then call him a "pussy," tell him he was "draggin' [his] dick in the dirt," and otherwise ignore his pleas.

Complainant states between March 12 and March 16, 2015, his immediate supervisor and a coworker began triggering his tic to strike himself in the testicles to the extent he became ill. He notes during that same period coworkers repeatedly made him "freeze." Complainant indicates his coworkers continued to trigger his tics to strike himself and freeze through April, and asserts Respondent's Field Coordinator and manager witnessed others triggering his tics on the job and did nothing to stop the behavior. Complainant states on July 24, 2015, a coworker triggered his freeze response and used the opportunity to tie Complainant to a chair. Complainant notes during the episode, another coworker called him "autistic," and his immediate supervisor not only witnessed the entire affair, did nothing to stop it, and encouraged the other's behavior.

Complainant asserts the harassment complained of affected a term, condition or privilege or employment and was so pervasive as to alter the working conditions of employment and create an

*WFEP #159-2015*
*EEOC # 32K-2016-00029*
*Page 3*

abusive work environment, noting the harassment caused him both public embarrassment as well as physical injury.

Respondent notes on July 25, 2015, Complainant contacted his Field Coordinator about mistreatment he received from coworkers. Respondent asserts the Field Coordinator immediately sent an email to crew supervisors stipulating that the mistreatment of Complainant was to stop.

In a video provided by Complainant, unknown persons can be heard discussing oil field operations. At one point in the video, an unidentified male voice can be heard saying "freeze" while shortly thereafter another male voice can be heard pleading "no" several times over.

A witness reports Complainant encouraged others on his crew to trigger his conditions. According to the witness, Complainant would show others videos taken of both Complainant and Complainant's father triggering their respective conditions[1].

A witness recalls Complainant's supervisor triggering Complainant to hit himself in the crotch.

Another witness reports observing coworkers trigger Complainant's condition, including one incident when Complainant was triggered to bark like a dog. The witness notes Complainant encouraged others to do it. The witness does not recall Complainant ever asking his coworkers to stop the behavior.

According to another witness, Complainant's coworkers triggered Complainant's Tourette's syndrome and, at least initially, Complainant did not seem to object and may even have liked the attention. The witness reports, however, that within a month or two of the witness observing the alleged harassment it was clear the behavior had gone too far and was out of hand. The witness indicates Complainant's job was negatively affected by the conduct of his coworkers.

One witness notes that coworkers would trigger Complainant two to three times a day, including making him stutter and repeat himself. The witness notes two Field Specialists would also trigger Complainant. The witness states Complainant told the witness that he did not like being triggered, but does not recall Complainant telling others to stop.

Still another witness reports observing Complainant tell others not to trigger him and denies Complainant ever encouraged coworkers to engage in the behavior.

Complainant asserts he was otherwise qualified for and satisfactorily performing his job, but despite his qualifications and satisfactory performance, Respondent denied him training and a promotion. Complainant explains he was enrolled in a supervisor training program and should have been sent to a supervisor course held by Respondent; however, Complainant states his immediate supervisor disclosed to him in July 2015 that he would not allow Complainant to go to the training due to Complainant's disability. Complainant relates the inability to attend the course

---

[1] Information indicates Complainant's father suffers from a form of Tourette's similar to Complainant's and that the condition can be hereditary.

prevented him from being promoted to a supervisor. Complainant asserts other similarly situated employees outside his protected group were not denied training in similar circumstances.

Respondent explains as an EO3, Complainant's next promotional step was to either to become an EO3-Treater and then go to Respondent's training school to become a Field Specialist, or go directly to the school and become a Field Specialist. Respondent note, however, that in order to become a field specialist, Respondent must first have a crew in need of supervision. Respondent maintains that at the time of the incidents at issue, Respondent's industry was in a downturn and, as a result, was undergoing significant downsizing. Respondent state, "People are not being sent to school and entire crews are being released, which is the reason for the lack of promotion opportunities for [Complainant], not any alleged disability." Respondent indicates that the only persons promoted in 2015 received their positions in the first quarter of 2015 and were only promoted in the sense that they were supervising crews.

Respondent denies Complainant was denied any bonuses and explain an EO3-Treater does not receive a bonus for supervising a crew and that the bonuses available to E03-Treaters are the same as those available to EO3s.

Respondent acknowledges Complainant's immediate supervisor would have a say in determining if Complainant attended Field Specialist School.

Evidence demonstrates Complainant was being trained to become a Field Specialist at the time of the alleged harassment and retaliation.

No witnesses recall hearing Complainant's supervisor stating he would not allow Complainant to attend Field Specialist School due to his disability.

Complainant asserts he engaged in protected opposition to ADA prohibited discrimination. Complainant states on July 25, 2015, he complained to his supervisor's supervisor about the disability based harassment and complained again to Respondent's human resources on August 26, 2015, that the harassment continued following his first complaint.

Complainant asserts contemporaneous with or subsequent to his protected activity he suffered adverse employment action. Complainant explains that following his July 2015 complaint, his supervisor and coworkers not only continued to harass him about his disability, but his supervisor and coworkers began threatening him about making the complaint as well. Complainant further reports he was denied bonuses he should have received as a supervisor in training. Complainant indicates that following his second complaint in August 2015, he was transferred to work in the yard washing trucks and was then later transferred to another crew where he was given grunt work and demoted from being a supervisor in training. Complainant asserts there exists a causal connection between his protected activity and Respondent's decision to allow the harassment to continue, deny him his bonuses, and demote him.

Respondent admits Complainant complained of mistreatment by his coworkers on July, 25, 2015, and dealt with the matter as noted above. Respondent further acknowledges Complainant

met with a local human resource representative (HR rep) on or about August 26, 2015, and reported that the mistreatment by coworkers had not stopped. Respondent asserts the HR rep conducted an investigation into the complaint and discovered some of Complainant's coworkers "may have teased him on occasion," but that Complainant had told his coworkers that he has similarly teased members of his own family that suffer from Tourette's.

Respondent asserts that following the conclusion of its investigation, the business issued a "Final Written Warning letter" to Complainant's immediate supervisor and a "Written Warning letter" to a coworker for inappropriate conduct. Respondent further explain the decision was made to move Complainant to a different crew as he was "having issues with his supervisor and crew members." Respondent note during that transition period Complainant was temporarily assigned to work in the yard, which Respondent states allowed Complainant to continue earning overtime while not assigned to a crew.

Respondent denies Complainant was ever demoted as he never received a decrease in title or pay. Rather, Respondent argues the move to the yard was a temporary measure that only lasted from August 26 to August 30, 2015.

Respondent acknowledges on October 5, 2015, Complainant sent an email to Respondent's West Basin Human Resource Manager complaining about his work conditions. Respondent maintains the West Basin Human Resource Manager thoroughly investigated Complainant's allegations.

Evidence demonstrates Complainant's immediate supervisor at the time of the alleged harassment and retaliation was a Field Specialist III and had the authority, in conjunction with the approval of a location manager, to approve or postpone Claimant's training.

A "Performance Appraisal and Development Plan" for Complainant for the appraisal period between January 1, 2014 and December 31, 2014, and prepared March 18, 2015, notes that Complainant had started training to become a Field Specialist. The evaluator goes on to state "I expect [Complainant] to be able to run a crew stand-alone by the end of 2015."

Evidence demonstrates on November 9, 2015, Respondent drafted an "Employee Warning" for one of Complainant's coworkers. The Warning indicates that at the beginning of October 2015, Respondent learned the employee was deliberately triggering a coworkers "tics." The warning goes on to indicate Respondent considered the behavior a violation of Respondent's policies regarding "fighting with or harassment (including sexual harassment) of another," and stipulated further violations may result in additional disciplinary action, including termination. The coworker signed the document on November 24, 2015; however, the signature line for the employee's supervisor remains blank.

Evidence further shows on November 9, 2015, Respondent drafted an "Employee Warning" for Complainant's immediate supervisor. This warning also notes that at the beginning of October 2015, Respondent became aware of the supervisor triggering "tics" of an employee under his supervision. Specifically, the warning notes the supervisor triggered an employee to hit himself in

the testicles. The warning further relates that when the supervisor became aware of others engaging in the behavior, he failed to end it. As with the coworker, the warning notes Complainant's supervisor's actions constituted misconduct and violated Respondent's policies of "fighting with or harassment (including sexual harassment) of another." The warning admonished the supervisor that should he have further infractions, he may be subject to additional disciplinary action, including termination. The supervisor signed the document on November 24, 2015. The warning does not indicate it is was a "Final Warning."

Evidence demonstrates two employees under the supervision of the same Field Coordinator and manager as Complainant completed Respondent's training school to become Field Specialists on November 20, 2015. Respondent made the decision to allow these two employees to enter the school was made by Complainant's Field Coordinator and manager.

A witness notes "things died down" a bit after the Field Coordinator sent an email directing the crew to stop triggering Complainant. Another witness reports Complainant's immediate supervisor told the crew to stop triggering Complainant in the spring of 2015 and avers that all such behavior stopped at that time. Another witness, however, does not recall any efforts on the part of Respondent's managers to stop the alleged harassment towards Complainant until Complainant filed an "official" complaint. The witness could not recall when Complainant officially complained about the harassment, but relates Complainant took his grievance "to the top" past the "field officer." The witness notes that shortly after Complainant filed his official complaint with Respondent, he was moved to another crew.

A witness recalls an email being sent out regarding triggering Complainant. The witness notes, however, that the behavior continued, although not as regularly as before the email. The witness indicates two Field Specialists continued to trigger Complainant despite the email. The witness went on to note that, following the email, several crew members, including Complainant's immediate supervisor, began avoiding Complainant.

A witness states Complainant approached a Field Specialist of another crew about the possibility of joining the other Field Specialist's crew. The witness notes that the new crew already had an individual in the Field Specialist training program and was slated to go to the Field Specialist School ahead of Complainant in the second quarter of 2016. The witness indicates Complainant was intended to go to the school after the person ahead of him; however, Complainant left Respondent's employ before that could occur.

A witness notes an employee other than Complainant also told the Field Coordinator that the crew's triggering of Complainant was a problem that needed to stop. The witness indicates that following complaint, both Complainant and the other employee received the "cold shoulder" from the crew. The witness further reports seeing a text message from a coworker to Complainant telling Complainant to stop the complaints or the coworker was going to "kick his ass."

The West Basin Human Resources Manager states that as far as he knew there was no schooling to become a Field Specialist in 2015.

No evidence was found demonstrating Complainant was subject to worsening duties upon transfer to the new crew.

### III.   Conclusion

The Americans with Disabilities Act of 1990 (the ADA), 42 U.S.C. § 12101 *et. seq.*, provides that no employer "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

According to the ADA, a "disability" with respect to an individual means, "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1). Under the ADA, a qualified individual with a disability means, "An individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111.

The Wyoming Fair Employment Practices Act of 1965 (the Act), Wyoming Statutes §§ 27-9-101 et. seq., provides that it is an unlawful employment practice for an employer "to refuse to hire, to discharge, to promote or demote, or to discriminate in matters of compensation or the terms, conditions or privileges of employment against, a qualified disabled person or any person otherwise qualified, because of age, sex, race, creed, color, national origin, ancestry or pregnancy[.]" Wyo. Stat. Ann. § 27-9-105(a)(i).

The Act defines a "qualified disabled person" as a "disabled person who is capable of performing a particular job, or who would be capable of performing a particular job with reasonable accommodation to his disability." Wyo. Stat. Ann. § 27-9-105(d).

Information indicates Complainant could establish he is disabled for the purposes of the ADA and the Act. The readily identifiable nature of Complainant's disability renders any contention Respondent were unaware of any disability Complainant may have had extremely specious.

Given the allegations, Complainant's case is best analyzed under the burden shifting scheme the United States Supreme Court adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this process, Complainant bears the initial burden of establishing a *prima facie* case of unlawful discrimination or harassment in violation of the ADA and/or the Act. Should Complainant successfully meet his *prima facie* burden, a legal presumption of unlawful discrimination arises and the burden shifts to Respondent to articulate a legitimate, non-discriminatory reason for the adverse employment action. Should Respondent carry that burden, then Complainant has the opportunity to prove by a preponderance of the evidence that Respondent's proffered legitimate reasons were not the true reasons, but were pretext for discrimination. *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). A Complainant can show pretext by revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions [such] that a reasonable

factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (citations and quotations omitted).

In this case, the initial burden of proof is upon the Complainant to make a *prima facie* showing he was unlawfully discriminated against or harassed in violation of the ADA and/or the Act. Specifically, to meet his *prima facie* burden of proving disability-based harassment, Complainant must show:

1.   He is a member of the protected group, "disabled";
2.   That his disability substantially limits a major life activity;
3.   That he was subjected to harassment based upon his disability;
4.   That the harassment complained of affected a term condition or privilege of employment and was so pervasive as to alter the working conditions of employment.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

In *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005), the court held in order to determine if a working environment is unlawfully hostile, a finder of fact must "examine all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." In this case, the incidents noted by witnesses clearly show Complainant was subjected to disability-based ridicule so regular and pervasive that it manifested in actual physical harm to the Complainant.

An argument could be made that Complainant suffers from an "unwelcomeness" problem, wherein he invited attention to himself by discussing his triggers with others, and seemed to enjoy being trigged for at least some period of time. The evidence however, does not support such assertions, as witnesses make clear Complainant came to dislike being triggered and asked others to stop the behavior. In *Rahn v. Junction City Foundry, Inc.*, 152 F.Supp.2d 1249, 1257 (D.Kan. 2001), the defendant argued the plaintiff's socialization with one of the alleged bad actors, among other behaviors, demonstrated the sexual harassment at issue was not unwelcome. The Court, however found otherwise, stating, "That fact that plaintiff laughed at dirty jokes does not establish as a matter of law that the harassers' conduct ... was welcome." The *Rahn* Court found the relevant inquiry into the welcomeness of the alleged incidents centered on the plaintiff's complaints to others about the conduct, which established the behavior as unwelcome. In accordance with *Rahn*, Complainant's repeated complaints sufficiently demonstrate he found his supervisor's and coworkers' conduct unwelcome.

In *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 745 (1998), the U.S. Supreme Court established an affirmative defense for employers in cases of unlawful harassment. That defense comprises "two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably

failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." The Court went on to explain:

> While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Id.*

In the present matter, Respondent cannot avail itself to the *Ellerth* defense. Evidence indicates Complainant and others made repeated complaints about the harassments. In *Ellerth*, the Court noted "an employer can be liable, nonetheless, where its own negligence is a cause of the harassment. An employer is negligent with respect to … harassment if it knew or should have known about the conduct and failed to stop it." *Id.* at 759.

In *E.E.O.C. v. The Spud Seller, Inc.*, 899 F.Supp.2d 1081, 1090 (D.Colo. 2012), the court noted a plaintiff can establish the employer's negligence if he or she presents "evidence sufficient to establish that (1) the employer had actual knowledge or constructive notice of the harassment, and (2) the employer's remedial and preventive responses to the harassment were inadequate." According to the court, "Actual knowledge is established where the plaintiff has reported harassment to a management-level employee. Constructive notice may be inferred when the harassment is 'highly pervasive' and should, in the exercise of reasonable care, have been discovered by management-level employees." *Id.* at 1090-91. The Court went on to note reports from other employees can also be used in determining if the employer should or ought to have known of the harassment. In the present matter, evidence demonstrates Respondent knew of the harassment but Respondent's actions taken to address it proved inadequate.

Under *Ellerth*, once an employer is made aware of unlawful conduct it must then take adequate and effective action to end the behavior. The Tenth Circuit Court of Appeals has held:

> In cases where effectiveness is not readily evidenced by a stoppage [of the harassment at issue], we consider the timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the response was proportional to the seriousness and frequency of the harassment. Courts have explained that simply indicating to a perpetrator the existence of a policy against harassment is usually insufficient. By way of example, responses that have been held reasonable have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral or written warnings to refrain

from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline, including suspension and termination.

*Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 676 (10th Cir. 1998) (citations omitted).

In the present matter, Complainant's first report to a manager failed to prompt any investigation into the situation and only resulted in an email that evidence indicates was summarily ignored by Complainant's coworkers and supervisor. Given that Complainant was faced with physical repercussions due to the harassment, and as an oil field worker essentially trapped with his coworkers for significant periods of time with no direct supervision from a manager, a simple email advising others to stop the behavior does not seem reasonably sufficient to end the harassment going forward. Complainant next complained about continued harassment in August 2015, but no disciplinary action ensued from that complaint either. Instead, Complainant suffered the ignominy of being removed from the crew to resolve matters. While transfers or schedule changes can constitute adequate and effective action to end harassment, the victim of such harassment should not endure any negative repercussions aimed at ending the harassment. Moreover, actual disciplinary measures against the harassers did not take place until Complainant filed a third complaint on October 5, 2015, and then it was almost two months later before warning letters were issued to any of the bad actors.[2]

Next, in order to meet his *prima facie* burden for proving disability-based discrimination for failure to train, Complainant must show:

1.   Membership in the protected group, "disabled";
2.   That he was satisfactorily performing his job;
3.   That despite his satisfactory performance he was denied training;
4.   That other similarly situated employees outside of his protected group were not denied training in similar circumstances.

The evidence demonstrates Complainant could establish a *prima facie* case for failure to train. Respondent, in turn, have presented a sufficiently non-discriminatory reason for failing to send Complainant to Field Specialist school: namely, that there was insufficient need for such training because there were no available Field Specialist positions to move Complainant into and there were no employees attending such training after the first quarter of 2015. Such a rationale is sufficient to return the burden to Complainant to demonstrate Respondent's reasons are a mere pretext for discrimination.

Evidence demonstrates that, contrary to Respondent's assertions and the Western Basin Human Resources Manger's recollections, two individuals under the same Field Coordinator and manager as Complainant completed Field Specialist school in the fall of 2015 and ostensibly went on to supervise crews. Such information sufficiently undermines Respondent's rationale for

---

[2] While evidence demonstrates a coworker and Complainant's supervisor eventually received written warnings, evidence definitively establishes there were more individuals responsible for the harassment who never received any formal reprimand for their conduct.

*WFEP #159-2015*
*EEOC # 32K-2016-00029*
*Page 11*

denying Complainant and demonstrates pretext under the court's findings in *Garrett*, 305 F.3d at 1217.

In *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003), the court held that, "Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of defendant's true motive." Based on that holding, Complainant's allegation he was denied training due to his disability stands.

In order to establish a *prima facie* case for unlawful retaliation, Complainant must show:

1.    He engaged in protected opposition to ADA-prohibited discrimination;
2.    That contemporaneous with or subsequent to his protected activity, he suffered an adverse employment action; and,
3.    That there exists a causal connection between his protected activity and Respondent's decision to take adverse employment action against him.

*Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984).

In this case, the evidence demonstrates Complainant could establish a prima facie case for unlawful retaliation. Evidence shows Complainant engaged in ADA-protected opposition to unlawful discrimination and, following such activity, he was ostracized and subjected to additional harassment, threats of physical harm, and a transfer that put him further behind to obtain the Field Specialist training he sought. Generally the *McDonnell Douglas* burden shifting model is the appropriate analytical tool for adjudicating Complainant's allegations he was subjected to unlawful retaliation. Unfortunately, however, Respondent failed to fully address Complainant's retaliation allegations, but Respondent seems to tacitly deny Complainant was subjected to further harassment following his August 26, 2015 complaint and offers a sufficiently non-discriminatory rebuttal to Complainant's assertion he was subject to a demotion (i.e. Complainant did not suffer any loss of pay or title following his move to a new crew and was not denied any bonuses as no additional bonuses were allotted to his position as an EO3).

The evidence, however, belies Respondent's position. Evidence indicates that following Complainant's first complaint, he was ostracized and subjected to continued harassment and threats of physical harm. Moreover, once Respondent moved him to a new crew, Respondent continued to deny him training as he became the second person in line on the new crew to receive Field Specialist training.

The United States Supreme Court has held that any adverse action which might "dissuaded a reasonable worker from making or supporting a charge of discrimination" could constitute an act of retaliation. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, (2006). Certainly, a reasonable employee might be dissuaded from filing a charge of discrimination if said employee knew doing so would result in a transfer that would only put his career aspirations further behind.

The Supreme Court has also held that retaliation claims need to demonstrate "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338 (2013). In the present matter, it is clear that but for Complainant's August 26, 2015 complaint, he would not have been transferred to a new crew.

Based on the above analysis, I have determined that the evidence obtained during the investigation did establish a violation of state and federal statutes. I thereby issue a probable cause finding in that, based upon a preponderance of the evidence, there is probable cause to believe discrimination occurred. Specifically, the evidence supports the following conclusions:

1.   Complainant is a member of the protected group, "disabled";
2.   That he was subjected to disability-based harassment;
3.   That the harassment complained of affected a term, condition or privilege of employment and was so pervasive as to alter the working conditions of employment and create an abusive work environment.

And:

1.   Complainant is a member of a protected group;
2.   That he was satisfactorily performing his job;
3.   That despite his satisfactory performance he was denied training;
4.   That other similarly situated employees outside of his protected group were not denied training in similar circumstances.

And:

1.   Complainant engaged in protected opposition to ADA discrimination;
2.   That contemporaneous with or subsequent to his complaints he suffered an adverse employment action;
3.   That there exists a causal connection to his complaints and Respondent's decision to take an adverse employment action.

EEOC Form 161-B (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: Amil Hale<br>1724 N. 8150 W.<br>Mendon, UT 84325 | From: Denver Field Office<br>303 East 17th Avenue<br>Suite 410<br>Denver, CO 80203 |
|---|---|

☐ *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 32K-2016-00029 | **Philip Gross,**<br>**Supervisory Investigator** | **(303) 866-1318** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[ ] The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*[signature]*

**OCT 29 2018**

Enclosures(s)

**Amy Burkholder,**
**Field Office Director**

*(Date Mailed)*

cc:   **Schlumberger; Stephen L. Scott, Esq.; Greg Asay, Esq.**

**EXHIBIT**
**2**

**Budge Clinic Medical Specialists - Neurology**

1350 N 500 E
Logan, UT 84341-2400

**Intermountain
Healthcare**
*Healing for life*

| | |
|---|---|
| Patient Name: **HALE, AMIL JOHN** | Encounter: **1201381438** |
| MRN: **542101091** | Date of Service: **3/11/2016** |
| DOB: **8/5/1987**   Age: **28 years**   Gender: **Male** | Provider: **WILLIAMS,MD,MICHAEL H.** |

## *Letters*

| | |
|---|---|
| Document Type: | Patient Letter |
| Service Date/Time: | 3/11/2016 02:00 MST |
| Result Status: | Transcribed |
| Document Subject: | |
| Sign Information: | |

Date of Service: 03/11/2016
To Whom It May Concern.

I am a board certified neurologist who has recently evaluated Mr. Hale for an unusual movement disorder.  He suffers from a form of neuropsychiatric hyper-startle syndrome.  Another term that can be used is hyperekplexia.  I recommend any work accommodations to help with this condition should be provided to him.

MHW/bh  VID: U874054  TID: 10969521  D: 03/11/2016 16:43:39  T: 03/12/2016 22:53:32



EXHIBIT
**3**